We'll hear from uh counsel for the upon. Please go. Thank you your honor. Hopefully you can all hear me. Um may it please the court. My name is Frank Geschat and I represent the defendants, the acting director, and the chief of mental health services of the department of corrections. This court should reverse and vacate the permanent injunction because the district court committed two foundational errors regarding the governing eighth amendment standard and the permissible scope of relief under the prison litigation reform act. First, the court incorrectly reviewed defendant's actions under an objective test based on a flawed belief that systemic cases are reviewed under a different standard. Second, actually the eighth amendment requires an inquiry into the defendant's state of mind in all cases and the court's finding on that ultimate issue of fact is incompatible with the conclusion of deliberate indifference in this case. Second, the court failed to follow the blueprint for crafting an injunction under the PLRA that this court provided in Westerfer. The court wrongly decided that Westerfer did not apply to this case and consequently issued an injunction that violates the statute by setting exact staffing requirements and other unnecessarily detailed conditions. Turning to the eighth amendment, the district court's decision demonstrates that it applied an objective test in three ways. One, it stated that systemic claims are treated differently than individual ones. Two, it made findings of fact about the defendant's state of mind that are irreconcilable with the determination that they acted with subjective indifference. And three, the court repeatedly framed the test in objective terms. As to the first point, the court began its deliberate indifference analysis by stating that it interpreted this court's decisions in Wellman and Cleveland-Purdue as holding that systemic cases form a second category of deliberate indifference actions that are reviewed under a standard that allows a finding of deliberate indifference based on a showing of inadequate care. The court thus classified systemic cases as a separate category and framed that test in objective terms. Those cases, however, do not support the conclusion that systemic cases are reviewed under an objective test. And in fact, they would be inconsistent with subsequent Supreme Court precedent if they did. Indeed, the Supreme Court in Wilson clarified that the subjective standard applies to both individual and systemic cases, finding no basis for distinguishing between the two. Second, the court's findings of fact about the defendant's mental states are incompatible with an ultimate conclusion of deliberate indifference. Most importantly, the district court directly found that Dr. Hinton sincerely believed that the Department of Corrections was providing effective care as of the time of the permanent injunction hearing based on previous improvements in care and additional staffing. Indeed, the court found that the defendants violated the Eighth Amendment despite their good efforts against demonstrating that it was basing its determination on its assessment of the objective adequacy of the services rather than the defendant's state of mind. Now, it's true that the court did disagree with defendants' opinions objectively about whether or not they were providing adequate care, but the disagreement was over whether their opinions were objectively correct, not whether they were sincerely held. And that distinction is really what gets at the core of the district court's error. The finding about the defendant's sincere beliefs about the sufficiency of the care that was being provided should have been determinative because that's the ultimate fact at issue in a deliberate indifference analysis. While the objective adequacy of the care is certainly a factor that the court can take into consideration and something for the court to consider when making its credibility determination about the defendant's testimony, it's not the end of the analysis. It's just a step along the way. And here, the court committed reversible error by relying on its objective analysis to find states of mind. The third part of the decision is set out on page 39 of our opening brief, and that's that there are just numerous instances throughout the decision where the court frames the test in objective terms. In each instance, it shows that the court compared the evidence against some objective standard of what it believes to be a sufficient level of care and found that the deliberate indifference standard was met based purely on that objective finding. And so, taking all of those things together, the decision as a whole clearly demonstrates that the court applied an objective standard in this case. How do you reconcile that characterization with the last several pages of the district court's opinion, where he basically says, the only way you get this crowd's attention is when you're holding them accountable. They've been at this since 2004, and they simply don't get it. I mean, that's basically the message of the last three pages of that opinion. Well, that's not inconsistent with our reading of the decision because Dr. Hinton's testimony, to a large degree, was based on improvements that occurred since the preliminary injunction hearing. And the court actually examined Dr. Hinton at some length during the permanent injunction hearing about how his opinion had, how he had formed this opinion of adequate care, which the court viewed as inconsistent with his testimony in the preliminary injunction hearing. And in that testimony, Dr. Hinton explained that there were a number of changes, particularly there had been significant increases in staffing, the number of full-time equivalent psychiatrists had increased from about 30 to about 55, and there had been a number of updated procedures on many of the aspects of crisis care, segregation, and medication management. And he observed various improvements in the level of care that was provided. Is it your view, then, that as long as there is some forward motion, there's no Eighth Amendment violation? No, Your Honor, that's not our position. In a given case, the trier of fact could find that even though there was some response or some improvements were made, the court of the trier of fact could find that they were so deficient that it could then infer that from the obvious deficiency of those actions that the defendants had acted with the requisite mental state. The problem here is that the court made the finding that the defendants sincerely believed that they were providing adequate care. So to bring this actually back to Petty's, which is, I think, a good starting point in any deliberate indifference case, Petty's talked about all the different ways that a prisoner could present evidence that could then support an inference of deliberate indifference. And this case, or this court, often reviews deliberate indifference cases honest in a summary judgment posture. And this court, in those instances, has to look at the evidence and sort of predict, could a reasonable trier of fact infer deliberate indifference from these facts? In this case, however, we know that the court did not make that inference because the court specifically stated that it found the defendants' belief that they were providing effective care to be sincere and genuine. Consequently, the court committed reversible error by basing its deliberate indifference decision solely on its objective analysis of the adequacy of care. And turning to the issue of the PLRA, there's a second independent reason for vacating the permanent injunction in this case, and that's because the injunction violates the limitations on prospective relief that are contained in the PLRA. The core of the court's error is that at the outset it decided that Westepher was not applicable to this case. Consequently, the court did not follow the blueprint for crafting injunctive relief that this court set forward in Westepher and therefore ended up issuing an injunction that violated those limits. In Westepher, this court directed district courts to craft injunctions under the PLRA in general terms and then to have the defendants verify that their plan satisfies the Constitution. That blueprint ensures compliance with both the text and the purpose of the PLRA, ensures compliance with the text by making sure that the injunction's terms extend no further than necessary to correct the federal violation, and ensures compliance with the purpose by preserving prison administrators' flexibility to make decisions as in how they run their prisons. Now the court... I gather that the district judge's answer to that is the level of generality of the injunction has to depend on the circumstances of the case. Here I've got a foot This is going to move. These four items are going to move in the right direction. The only time you do something is if they in fact have a specific focus and are monitored on that specific focus. That's who we're dealing with. Now can we say that Westepher requires that when you're facing a recalcitrant defendant that you use the same level of scrutiny that you would use for a non-recalcitrant defendant under other circumstances? Yes, Your Honor, because what Westepher looked at, it compared the terms of the injunction against the PLRA and what it requires. And so in looking at the injunction's terms, you look, do those terms require the defendant to do anything more than the minimum that's necessary to correct the violation? And regardless of what the defendant's compliance or non-compliance with prior agreements, that really doesn't change whether the terms of the injunction, if followed, go beyond what's necessary or are the minimum required. And so the district court erred by finding that to be a basis for distinguishing Westepher. But wouldn't a general, an injunction phrased solely in general, very general terms against a recalcitrant defendant simply give the recalcitrant defendant an opportunity to talk things to death? No, Your Honor. And also I would look, I push back on the characterization of the defense as recalcitrant because, in part because prior to this permanent injunction, the district court, or there hadn't been any prospective relief issued that had complied with the limitations of the PLRA. So what the PLRA does, it pretty much creates a two-step process. In the first instance, the injunctive relief must be the least intrusive means necessary. And whether that's through an injunction or through a consent decree that is accompanied by a district court's finding that the terms do meet those limitations. And then in the event the defendant does not comply with that injunctive relief, the court can issue an enforcement order. And the enforcement order would not be subject to those same limitations. And the terms in this injunction are really more, you know, would be appropriate in an enforcement order. But the problem here is that the district court skipped the first step by not issuing initially an injunction that complied with the PLRA. Instead, it went straight to, it kind of assumed that the defendants would not comply with an injunction. And so it sort of skipped to step two and issued terms that would be more appropriate in an enforcement order. And given that the court found that it did not need to comply with Westifer's guidelines when it issued the injunction, the terms that it that's with regard to staffing, where the court set very exact staffing requirements, spelling out the number of people that need, the specific number of people that need to be employed at various identified positions. Even the district court itself recognized that there's no constitutional requirement that the department employ any specific number of people. And so that part of the injunction violates both the text and the purpose of the PLRA because it requires defendants to do more than what is constitutionally required. And at the same time, it restricts their flexibility to deal with future issues as they see fit. For example, if the injunction calls for. How does the permanent injunction specifically take away more flexibility than the consent decree? Well, the, I would, two answers to that. One is that the injunction requires a specific number of people at various different positions. But second, the agreement that the parties entered into was not a full consent decree until the court issued relief under the provision allowing it to provide injunctive relief under the PLRA. Because as this court explained in Doe, a consent decree under the PLRA requires a judicial finding that the terms of the consent decree comply with the limitations in the PLRA and are the least restrictive needs. And here, the district court did not make that finding when it approved the agreement. It made the normal findings you would when you would apply a settlement agreement. And even the terms of the condition, or the terms of the agreement contemplated that any injunctive relief that the court entered pursuant to the agreement would have to comply with the PLRA's terms. So, I mean, I think kind of the, so the agreement shares some aspects of a settlement agreement and a consent decree, but I think it's best to think about it as sort of a springing consent decree because you don't have any judicial findings that the terms in the agreement or through an injunction meet the PLRA's limitations until you have an injunction like the one that the court entered. I'm not too sure that I'm clear on why the court did not make those PLRA findings at the time of the consent decree. Well, I think at that point, everybody believed they were entering into a settlement agreement. And the, and also, I mean, I think just even under the terms of the agreement, again, it contemplated that there might be a point in the the court would then at that point issue relief that complied with the limitations under the PLRA. So, I don't think, you know, this should be characterized as an oversight or something like that. The agreement itself provided for subsequent relief that complied with the PLRA if you met that point. And that's important, too, because the purpose of the judicial findings for the consent decree are to make sure that, you know, these are the least intrusive means of protecting the federal rights. This agreement, like any other, was a compromise. I would not be surprised if, you know, defendants think that the agreement requires them to do more than they thought was constitutionally necessary. And if plaintiffs thought that the agreement requires them to do less, and they reached this compromise, and that was the agreement. And so, and in addition, the other parts of the injunction also violate the PLRA. The section on segregation addresses a lot of issues that weren't even in the findings of a violation that the district court found, so they necessarily went beyond what was necessary to correct the violations, since the court did not find a violation as to those issues. And even with regards to out-of-cell time, which the court did find a violation to, it required more onerous terms than were in the agreement by requiring both structured and unstructured out-of-cell times for inmates that had been in segregation for 16 days or more, when the agreement required it for 60 days or more. So unless your honors have any further questions, I would like to reserve the rest of my time for rebuttal. Thank you. Your honors, my name is Cheryl Hirschman. I think that the IDOC is mistaken in terms of what the appropriate standard is. The experienced and knowledgeable trial judge did what he was required to do. He measured the IDOC's response to an acknowledged serious problem and determined that that response was not reasonable. They had not taken reasonable measures to abate an intolerable risk. And if we look at Farmer, Farmer Note 9 specifically says, under these circumstances, that is precisely what the trial judge is supposed to do. If, for example, the evidence before that the prisoner faced an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness any more than prison officials who state during the litigation that they will not take reasonable measures to abate an intolerable risk of which they are aware could claim to be subjectively blameless for purposes of the Eighth Amendment. And it is precisely this argument that because Dr. Hinton says, I think we've done enough, that they claim that the district court is bound to accept his subjective statement. And that is directly contrary to Farmer. And it also ignores Pettus, because if it were true that the subjective state was sufficient standing by itself, then the doctors who achieved summary judgment in Pettus, there wouldn't have been a reversal. They thought they had done the right thing. And the en banc court said, no, we have to test their subjective beliefs against objective reality. Were there other things that they knew or should have considered that were within their account that they ignored? And what is remarkable is that at page 41 of the IDOC's brief, they recognize that subjective belief is insufficient. And that the issue is whether the defendants had disregarded the risk of harm by persisting in conduct they knew to be ineffective. And your honors, with respect to ineffectiveness, there's an exhibit 59, which comes from the Lieutenant Governor and was stimulated by Director Baldwin to Wexford. And the subject is the failure of Wexford to provide sufficient prisoners. We aren't being able to deliver the care we need to deliver for them. This exhibit comes in the middle of the preliminary injunction here. And by the time of the permanent injunction, this shortfall still exists. Exhibit 59 is recognition that the highest levels of the government of Illinois, there was an appreciation of the failure. And as the district court judge said, one of the problems with the department is that it has continued to rely on Wexford, who has continuously failed ever to provide the contracted for number of psychiatrists, QMHPs, and other critical people to deliver care. And he said, at some point, the department itself has to do something to get the number of people that are out of the air, quite to the contrary. Exhibit 9, which is the department's own plan on meeting the staffing for seriously mentally ill prisoners. At that time, when they delivered Exhibit 9, 2014, they said they needed the staff that he then ordered them to have five years later. They hadn't achieved five years. The staff they said were necessary, even though in that time frame, the number of seriously mentally ill prisoners increased by a thousand. So, and he didn't order, he didn't tell the department, put three psychiatrists at Dixon, put five MHPs at Piatt. No, he left them their discretion. There is no two-step PLRA process. The PLRA says, if you have a constitutional violation, you issue an order to clear it up, to do something that mitigates the order. An order that the IDOC suggested was, tell us that we have to follow the constitution. Well, no, why on earth is that even a valid injunction? It doesn't have any instruction as to what is to be done. What do you have to say about your brother's suggestion that the district court, in effect, skipped a step here and should have issued a order insisting on compliance with the consent decree before, for the settlement, before moving on to injunctive relief? Um, there, your honor, we specifically understood that the settlement agreement was not by its own terms, because it was not a consent decree, enforceable, that we had to start at the constitution and we had to prove a constitutional violation, which we did. And then the PLRA on its face says, when the court is faced with a violate, a constitutional violation, it should issue an order, a limited order, limited in the sense of not taking over control of prisons, but not an order so limited that the constitutional violation isn't resolved. And PLRA is a perfectly good example of numerous orders that the federal courts had to issue in order to try to bring the California prison system into compliance with the constitutional violations. There is no statement in PLRA, and indeed, quite to the contrary, the Supreme Court said that they issued many orders that were necessary. And finally, finally, they had to come to the point where they ordered, the three-judge court ordered California to release prisoners. So this construct is not consistent with the language of the PLRA, is not consistent with any case that they have cited, that there is this required two-step. And it also is not consistent with the fact that Congress left the ability to craft an injunction to the district court with the caveat that it had to address the constitutional violation. They would not, they would have this situation where there's a preliminary injunction to cure the violation. It doesn't. They don't. Then there's a permanent injunction, and we're supposed to have an injunction that is toothless. I don't think there says that. Well, it's, is it possible that the district court here jumped the gun? In other words, should the district court have handled this as an enforcement of the consent decree initially and held off on entering injunctive relief? I'm sorry. He couldn't do that, Your Honor, because at that point, under the PLRA, you cannot enforce a settlement agreement in federal court. It's forbidden. So the only avenue for the federal judge would be as though this were a new case that we filed saying, look, here are five significant constitutional violations. We would like an injunction to stop this. And the PLRA doesn't impact the ability to start a case and say, we want injunctive relief. Even if, even if we have reached a settlement which has been negated as, you know, the, as the courts monitor repeatedly. Tell me a little bit more about this, about this settlement then. This was, the settlement was approved by the district court. Am I right? It was. And did he retain jurisdiction over the case? He retained jurisdiction over the case. And why couldn't he then enter an enforcement order with respect to the consent decree? Because the consent decree specifically provided that there would be no such orders. That was the deal. The only thing that we could get from the district court judge was an injunction with respect to a constitutional violation. So to, essentially, it recuts the deal. I think it's Exhibit 1, Section 41, I think is the enforcement section. So, and of course, if it were a consent decree, we wouldn't even need any steps. The court could simply enforce it as, as this court held in L1, I think. Mr. Hirschman, would you address compliance with our decision in Westerfer? The district judge distinguished it and thought it did not apply. Westerfer. Is that a legal error? I'm sorry? Isn't that a legal error? No, I don't believe so. Because what happened in Westerfer, as your honor knows, is there was already a constitutional determination as to what kind of process was due in the situations that Westerfer addressed. And so, when the dependent came up with a scheme with respect to handling certain kinds of issues, it could voluntarily do that because it was more than the Constitution required. But when the district court incorporated that scheme into an order compelling them to maintain this scheme with respect to the issues in Westerfer, that was beyond the court's power because the power was limited to the limits of the Constitution. There's no evidence here that the staffing is excessive to the constitutional limits. Quite to the contrary, the testimony of Dr. Hinton is that the reason we contracted with Wexford for X number of people was because we needed them to provide the care. And there is no decision I'm aware of where the Supreme Court says you can't order constitutional care. Plata is directly to the contrary. And so... The broader point of the decision was that certain levels of staffing, certain levels of that was a due process case, cannot be constitutionalized in an order under the PLRA, an injunctive prospective order, that prison officials can't be locked in as an operational matter under the PLRA's requirement of narrowly tailored and closely drawn relief. That prison officials need to be left with some operational authority to address constitutional concerns within prisons with some flexibility administratively. And that locking in injunctive requirements at the level of specificity that the court did in Westerfer, which this injunction order in this case is even far more specific in terms of level of staffing and specific requirements in different levels of care within the institution. It's highly, highly specific. And those become constitutional baselines under this injunction, which limits the institutional flexibility that prisons need to respond to conditions. And that's that broader point of the Westerfer decision, that the whole point of the PLRA's limitation on the scope of an injunctive remedy is to preserve the institutional flexibility. We don't permit courts to run prisons. That's the point of the PLRA. But we do... What this order does is permit the court to run the prison. No. With all due respect, it does... The judge is setting staffing levels. The judge is setting different care levels in different, you know, contexts within the prison and segregation, etc. So the court is effectively running the prison. The delivery of mental health care. In the first instance, A, the defendants agreed to... Voluntarily agreed using their discretion in running the prisons to an agreement that committed them to doing those things. The same is true in Westerfer. The prison there developed the 10-point plan for addressing the due process concerns and was implementing it. But they did enter into a contract with... It's not a contract, true. But it was devised by the prison. So that point doesn't get you very far. But the secondary point is... The... But to simply articulate, you have to give constitutional care in an order, is not an order that can be enforced. There is no way to measure, again, whether they have failed in their obligation to fulfill their responsibilities and flexibility. When they have failed to do that, just as in Plata, it is perfectly permissible to tell them to build prisons, build hospitals, hire people. All of those orders occurred in Plata. And ultimately, even that wasn't enough to get the... The California Department of Corrections to provide constitutional care. So it cannot be that an order, when you're faced with a situation where the department is supposed to provide constitutional care, everyone agrees to that, is the prisoners are suffering for the failure in all the categories. The testimony at the preliminary injunction hearing was uncontested. Everyone agreed to that. And at that point, Westerford doesn't deal with a situation where that kind of harm is occurring. And it isn't correct, I believe, to read Westerford to say that the only kind of order in the face of a constitutional violation cannot address the actual harm. And that is the way the defendants read Westerford. They say, oh, just tell us to follow the Constitution. Well, that and that is... The judge asked them, by the way, what order should I enter? And they came back and said, enter an order that says follow the Constitution. That's the best way to address the problem. Your Honor? If we can go back to then to this question of orders in this case. I am at page seven of the district court's opinion, and he has the settlement agreement language right there. And it seems to say that if the district court finds the defendants are not in substantial compliance with a provision or provisions of the settlement agreement, it may enter an order consistent with equitable and legal principles. And then goes on, of course, to say not an order of contempt. It sounds like the district court can enter an order to enforce the consent decree, which is contrary, I believe, to what you told me earlier. We, in crafting that language, did not believe that he could simply issue an order to enforce the settlement agreement. That was our belief. Since I had to write it, you know, I could be wrong about what we actually achieved. We did not believe that we could simply ask him for an order to enforce the settlement agreement. If we could have, we would have saved ourselves a lot of trouble, and we would have avoided the issue of Westerville itself, because if we could simply have enforced the order. Thank you, Mr. Hirschman. That helps me. Thank you. In short, the IDOC is asking for really quite remarkable, something quite remarkable from this court, which is essentially to ignore what the district court found, to look at the facts again and reshuffle the deck. It's, you know, so well settled that that isn't what should happen on appeal. That, and then focusing on Hinton to say, because he had a sincere belief, which the judge rejected against the objective evidence, including the fact that Hinton testified two weeks before in his deposition, that when I asked him, do you have enough people to do the job? He didn't say yes. He said, we have procedures. And so this new notion, I think, was rightly rejected. There wasn't evidence that Dr. Hinton knew what was actually going on in the prison systems. He didn't know who was doing what work. And the internal audit function showed that throughout the system, they were failing. They were failing their own internal audits. Counsel, your time is long past. I'm sorry. Then I'm, I'm, unless your honors have further questions, I have nothing more to say. Thank you. Bruce, go ahead. Thank you, your honor. I'd just like to make three quick points in rebuttal. One about the eighth amendment and then the other two about the PLRA. On the eighth amendment, the Supreme Court and farmer adopted a subjective test. Specifically, it adopted the criminal reckless test, recklessness test, which was defined, which is defined through the model penal code as a conscious disregard of substantial risk of harm. And so that test requires that the defendants consciously disregard the harm, not just that they consciously knew of the risk. And that's consistent with Petty's. When the court went through the different types of evidence that may be presented to support an inference that the defendants acted with that mental state. But at the end of the day, the trier effect needs to draw that inference. We're not asking this court to reweigh the evidence or to make findings of fact that the district court did not find. We're just asking this court to give the correct legal consequence to the findings that the court made about the defendants' mental states. As to the PLRA, the first point is that regarding the 2014 staffing proposal, plaintiffs rely on this and the court relies on this to kind of try to establish that the staffing numbers were a constitutional minimum. But the 2014 proposal, by its own terms, simply proposes staffing that the department felt was adequate at that time to equate the adequacy of certain staffing numbers as the minimum necessary is to commit the same error that the district court committed in Westifer. And the third point is on PLRA. The court's plans rely on PLRA as a way to try to distinguish Westifer. But PLRA was a very different situation for two primary reasons. One is it dealt with the prisoner release order, which has its own different set of rules. But second and most importantly, the order in PLRA followed relief that had satisfied the limitations on prospective relief from the PLRA. That relief had, I think, in the two district court cases, one was through a consent decree and one was through an injunction. Those orders had been in effect for five and 12 years. So PLRA is very distinguishable from this case, both because it was preceded by injunctive relief that met the limitations of the PLRA and that relief had been ongoing for much longer than this year. Okay. Council, I have a question about your position on the remedial question. Number one, what is your understanding about the remedial options for enforcement of the settlement agreement? I understood it only to prohibit enforcement by contempt. Correct. Were there other remedial options, enforcement options for the settlement agreement? Well, I mean, there were a lot of preliminary options that could have occurred, but once we got to this point, what the district court could do was enter an injunction that complied with the limitations in the PLRA. Those limitations were written into the agreement itself. So Westerfer applied, regardless of whether you're, you know, pursuant to the PLRA or pursuant to the agreement, because the terms are identical. So pursuing injunctive relief was the only enforcement option available to the plaintiffs? I believe so, Your Honor. I mean, I'm sure the court could have said, you know, look, you need to do A, B, and C, or else I think you're in violation. But that wouldn't have sort of the enforcement teeth that an injunction order would have. All right. And then your position on the scope of the relief available under the PLRA, I did not understand it to be limited to, your position to be limited to an injunction that orders the state to comply with the constitution. Correct, Your Honor. It could be more specific than that. I mean, the point is to correct the violation. So in terms of staffing, it could be levels of staff necessary to address the different areas of where the court found a violation regarding the five subparts. It does not need to be as general as, you know, just comply with the constitution. But setting specific staffing requirements for specific positions with exact numbers goes well beyond both what's constitutionally necessary and it improperly infringes on administrative flexibility. Is it mostly the highly specific staffing components of the injunction that you consider to be problematic under the PLRA and Westifer? Or are there other aspects of the injunction that are contrary to the terms of PLRA? Staffing is the most problematic, but the terms regarding segregation and crisis care also violate the PLRA. The segregation, first of all, the court only found a violation as to out-of-cell time and medication management, but the terms in the injunction pretty much span the entirety of care and segregation. So in that sense, they go well beyond what would be required to cure the constitutional violation. And even as to out-of-cell time, it requires more than what was in the agreement. And similarly, the crisis, the terms on crisis care gets very specific in areas about the type of care when assessments need to be made and so forth. And so it would violate that part as well. Thank you. Thank you, Your Honor. And so unless Your Honors have any further questions, we would ask that you reverse the district court and vacate the permanent injunction. Thank you, counsel. Thanks to both counsel. And the case will be taken under advice.